SOUTHERN MACHINE COMPANY, Inc.,
Plaintiff-Appellant,

v.

MOHASCO INDUSTRIES, INC.,
Defendant-Appellee.

No. 17959.

United States Court of Appeals
Sixth Circuit.

Sept. 20, 1968.

**376**

Paul W. Sorrick, Jr., Chattanooga, Tenn., for appellant.

Lowry F. Kline, Chattanooga, Tenn., Jere T. Tipton, Chattanooga, Tenn., on brief; Miller, Martin, Hitching, Tipton & Lenihan, Chattanooga, Tenn., of counsel, for appellee.

Before O'SULLIVAN, CELEBREZZE and COMBS, Circuit Judges.

CELEBREZZE, Circuit Judge.

■■ This declaratory judgment action arose out of a licensing agreement between Southern Machine Company, Inc., (hereinafter "Southern Machine") Plaintiff-Appellant, and Mohasco Industries, Inc., (hereinafter "Mohasco") Defendant-Appellee. Southern Machine brought the action in the United States District Court for the Eastern District of Tennessee pursuant to 28 U.S.C. § 2201 joining as parties defendant Mohasco and Louisa Carpet Mills, Inc., (hereinafter

"Louisa"). Upon the motion of Mohasco, the District Court quashed service of process and dismissed the action as to it for lack of in personam jurisdiction. Since jurisdiction over Mohasco is indispensable for the full declaratory relief sought, Southern Machine has appealed the granting of Mohasco's motion. We reverse.

Service of process was made on Mohasco outside the State of Tennessee through the Secretary of State of Tennessee; but no question is raised concerning the adequacy of the notice or the opportunity to be heard[1] or the compliance with the service provisions of the applicable statute, T.C.A. § 20–236. The questions raised by this appeal relate solely to the power of a Tennessee court[2] to bind Mohasco by a judgment *in personam:* (1) Has the Tennessee legislature extended the jurisdictional reach of its courts to non-resident defendants in the position of Mohasco?[3] (2) Can the jurisdictional reach of Tennessee courts, consistently with due process, be extended to non-residents in the position of Mohasco? The two questions merge into one if the Tennessee legislature has authorized Tennessee courts to reach to the full constitutional limits in pursuit of non-resident defendants.

■ In 1965 the Tennessee legislature enacted a "long arm" statute, which, among other provisions, purports to give Tennessee courts jurisdiction over non-residents who engage in the transaction of any business in Tennessee as to "any action or claim for relief" arising out of that business transaction. T.C.A. § 20–

---

1. Cf. McDonald v. Mabee, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

2. The in personam jurisdictional reach of a federal district court that is located in Tennessee is determined by the law of Tennessee in diversity actions; Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292 (6th Cir. 1964); Smartt v. Coca-Cola Bottling Corp., 318

F.2d 447 (6th Cir. 1963); and a "long arm" statute may be used in a federal question action. United States v. First National City Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); Rule 4(e) and (f), Federal Rules of Civil Procedure.

3. A state is not required to exercise the full judicial power that the Constitution will permit. Perkins v. Benquet Consolidated Mining Co., 342 U.S. 437, 448, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

235(a).[4] In considering this Act, we can put to one side cases where the activities of a corporation are sufficient to justify the assumption of jurisdiction even for causes of action arising outside the forum state. Cf. Perkins v. Benquet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). The Tennessee Long Arm Statute is a "single act" statute by which the State only purports to assume jurisdiction over causes of action arising out of the defendant's activities in the State. Since the old "doing business" statute, T.C.A. § 20–220, contains the same limitation, however, some question has been raised whether the "transaction of any business" provision of the "long arm" statute extended the jurisdiction of Tennessee courts any further than the former Act; no authoritative Tennessee State court has yet interpreted the "long arm" statute. We think it is clear that for causes of action arising out of a non-resident defendant's business activities in the State, the Tennessee legislature intended to extend the jurisdiction of Tennessee courts over a non-resident to the full extent permitted by the Fourteenth Amendment.

First, the federal district courts that have interpreted the statute have unanimously found that the statute comprehends the full jurisdiction allowable under the Fourteenth Amendment. Hamilton National Bank of Chattanooga v. Russell, 261 F.Supp. 145 (E.D.Tenn. 1966); Temco, Inc. v. General Screw Products, Inc., 261 F.Supp. 793 (M.D. Tenn.1966); Tate v. Renault, Inc., 278 F.Supp. 457 (E.D.Tenn.1967); But Cf. Fayette v. Volkswagen of America, Inc., 273 F.Supp. 323 (W.D.Tenn.1967).[5] Second, the Tennessee Act is substantially the same as the Illinois Long Arm Statute, Ill.Rev.Stat. c. 110, § 17, which had been interpreted as extending jurisdiction to the constitutional limits long before enactment of the Tennessee statute. See Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957); see also Consolidated Laboratories, Inc. v. Shandon Scientific Company, Ltd., 384 F.2d 797, 800–801 (7th Cir. 1967). Third, as was well noted in Temco, Inc. v. General Screw Products, Inc., 261 F.Supp. 793 (M.D.Tenn. 1966) supra, " * * * [a] new statute would not have been needed had not an expanded interpretation been desired." 261 F.Supp. at 797. Finally, the Tennessee legislature specifically provided that the "long arm" statute was remedial legislation and was to be liberally construed. T.C.A. § 20–240.

Having found that the Tennessee courts are authorized to reach as far as the Constitution will permit, our sole problem is determining the limits that the Fourteenth Amendment[6] places upon

4. Southern Machine has also urged that in personam jurisdiction could be obtained over Mohasco under the two other provisions of T.C.A. § 20–235:
"(c) The ownership or possession of any interest in property located within the state. * * *
"(e) Entering into a contract for services to be rendered or for materials to be furnished in this state." We do not think that either of these provisions were intended to cover the situation in the instant case.

5. The views of commentators in the state also should be considered as persuasive. An expansion of the judicial jurisdiction of Tennessee courts was urged at an early date with a recommended statute similar in language to the present "long arm"

provisions. Overton, Broadening the Bases of In Personam Jurisdiction in Tennessee, 22 Tenn.L.Rev. 237 (1951). Also recent comments have expressed the view that the purpose of the present statute was to exercise the full constitutional power of the Tennessee courts. Note, Expanded Bases of Jurisdiction—An Examination of Tennessee's New "Long Arm" Statute, 18 Vand.L.Rev. 1484 (1965); Comment, Expanded In Personam Jurisdiction—Due Process and the Tennessee Long Arm Statute, 33 Tenn.L. Rev. 371 (1966).

6. It has been suggested that the assumption of jurisdiction over foreign corporations could in some cases violate the Commerce Clause. Erlanger Mills v. Cohoes Fibre Mills, 239 F.2d 502, 507

a state's extraterritorial exercise of in personam jurisdiction. In approaching that problem, a pedantic quibbling with the wording of the statute is inappropriate. The language is general and was intended to cover any business activity that has a substantial enough contact with the state to satisfy constitutional requirements.

With the issue thus narrowed, we turn to the facts of the instant case. In May, 1962, Mohasco and Southern Machine entered into a license agreement by which Southern Machine was authorized to manufacture and sell various tufting machine attachments on which Mohasco held the patent or licensing rights. The agreement contains the usual patent licensing provisions, disavowing any representation by Mohasco as to the validity and enforceability of the patents and prohibiting Southern Machine from attacking the validity of the patents, and also contains some provisions peculiar to Mohasco's licensing plan. For example, Southern Machine is not required to pay a royalty or fee for attachments made and sold in the United States; but attachments can be sold there only to parties whom Mohasco has licensed to use the attachments.[7] On the other hand, a foreign-use royalty must be paid on attachments sold outside the United States and the Mohasco Foreign Patent Area.[8]

By the terms of the agreement, Southern Machine is required to submit comprehensive quarterly reports to Mohasco. In addition, records must be kept relating to any sale, lease or loan of attachments, and the records are to be open to inspection by Mohasco for the purpose of verifying the accuracy of Southern Machine's reports and foreign-use royalty payments. The agreement also requires Southern Machine to obtain certain covenants from any purchaser, lessee or borrower of an attachment and requires that a specific notification plate be affixed to every attachment that is manufactured

(4th Cir. 1956); Sobeloff, Jurisdiction of State Courts Over Non-Residents in Our Federal System, 43 Corn.L.Q. 196 (1957); compare Cardozo, The Reach of the Legislature and the Grasp of Jurisdiction, 43 Corn.L.Q. 210, 214 (1957). Certainly, where the cause of action arose elsewhere out of a transaction entered into elsewhere and where the plaintiff did not reside in the forum state nor did the defendant engage in anything more than solicitation in the forum state, assumption of in personam jurisdiction could raise serious Commerce Clause questions. Davis v. Farmers Co-Operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996 (1923). But, since the Tennessee statute requires that the cause of action arise from the business transaction and since the Fourteenth Amendment requires that the transaction have a substantial contact with the state, it is unlikely that application of the Tennessee statute will ever be at odds with the Commerce Clause. If an overly burdensome situation should arise, the constitutional problem could be avoided by use of the doctrine of *forum non conveniens*, both in the federal courts, Gulf Oil Co. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and in the state courts, Zurick v. Inman, 426 S.W.2d 767 (Tenn.1968). Therefore, we do not consider the Commerce Clause as a serious obstacle to the assumption of jurisdiction in this case. Cf. Buckley v. New York Post Corporation, 373 F.2d 175, 183–184, 20 A.L.R.3d 942 (2d Cir. 1967), where it is suggested that *forum non conveniens* might assume constitutional stature in some situations.

7. Mohasco apparently collects a royalty from the parties licensed to use the patented attachments; for the agreement provides:

"14. MOHASCO hereby agrees to grant to all third parties designated by the LICENSEE non-exclusive, non-transferable licenses under the LICENSED PATENTS to use in the United States ATTACHMENTS obtained from the LICENSEE, provided, however, that MOHASCO shall have the right to refuse to grant such a license to a third party whose credit rating, based upon sound business judgment, is unacceptable to MOHASCO."

8. The agreement provides: "(e) the term MOHASCO FOREIGN PATENT AREA shall mean Belgium, Canada, France, Great Britain, Italy, and West German." Apparently, Southern Machine is not authorized to sell attachments in these countries. (Par. 3 of Agreement).

by Southern Machine. The agreement is to remain in force until January 2, 1978, unless sooner terminated.

Affidavits submitted by officers of the two corporations are in conflict concerning the nature of the negotiations leading to the execution of the agreement. But the assertion is uncontested that at the time the agreement was executed Southern Machine, a Tennessee corporation, had only one manufacturing plant, which was located in Chattanooga, Tennessee. Southern Machine says that the negotiations were primarily by long distance telephone between Tennessee and New York, while Mohasco contends that the negotiations occurred at its office in Amsterdam, New York in March, 1962. In any event, the agreement provides that it is to be construed as having been made in New York and in accordance with the law of New York; and both parties acknowledge that the agreement was drawn up by Mohasco, signed by Southern Machine in Chattanooga, and then finally executed by Mohasco in New York.

The record is not very well developed concerning the extent of performance under the contract by either party. What expenses Southern Machine incurred in altering its machinery and production schedules to produce the tufting machine attachments and what expenses it has incurred in marketing the attachments are not indicated in the record. Southern Machine asserts, however, that two Mohasco representatives came to Chattanooga to inspect the plant facilities and to explain how the attachments were to be built; but Mohasco denies that any of its agents have been in Tennessee on any matter relating to the licensing agreement. The record does show, however, that E'Con Carpet Mills, Inc, a Tennessee corporation located in Chattanooga, has been licensed by Mohasco to use an attachment produced by Southern Machine under this licensing agreement and that the Singer Company, Cobble Division, which is located in Chattanooga, is also manufacturing tufting machine attachments under some arrangement with Mohasco.

Although Mohasco is a New York corporation with its principal offices in Amsterdam, New York, it has divisions located in other states. Nevertheless, Mohasco has no office and neither owns nor leases any property in Tennessee. Nor has Mohasco qualified to do business in Tennessee or appointed the Secretary of State of Tennessee or any other person as agent for the service of process in that State. On the other hand, Mohasco has apparently managed to derive a profit from the commerce of Tennessee. A regional sales representative calls about six times a year on an independent Memphis distributor of Mohawk products. Also three salesmen, one of whom is a resident of Tennessee, solicit orders from retailers in the State; and one of Mohasco's divisions solicits orders by mail in the State. All orders from Tennessee, however, from whatever source, are mailed to the New York office for acceptance or rejection there, and all merchandise that is shipped into Tennessee is shipped from outside the State to the customer, presumably by common carrier.

The present controversy concerns the licensing agreement outlined above and a contract between Louisa Carpet Mills, Inc., a Kentucky corporation, and Southern Machine for the manufacture and delivery of certain machines, including some of the patented attachments. When the contract between Louisa and Southern Machine had been executed, Mohasco, pursuant to its agreement, approved Louisa for a use license. After delivery of one machine and preparation of the rest of the order, however, Louisa refused to take a use license because the patents covered by the license agreement had been held invalid by the United States District Court for the Northern District of Georgia. Mohasco Industries, Inc v. E. T. Barwick Mills, Inc., 221 F.Supp. 191 (N.D.Ga.1963). Aff'd 340 F.2d 319 reh. denied 342 F.2d 431 (5th Cir. 1965) cert. denied 382 U.S. 847, 86 S.Ct. 61, 15 L.Ed.2d 86 (1965). If Southern Machine would not deliver, Louisa threatened to obtain the machines elsewhere; and it is alleged in the complaint without

contradiction that other manufacturers without licenses from Mohasco have been manufacturing and selling the patented attachments " \* \* \* with impunity and without any apparent or effective action on the part of Mohasco to stop or prevent such manufacturing or sales. \* \* \* " Upon being advised of the circumstances, Mohasco, nevertheless, refused to waive the use licensing requirement for Louisa. Southern Machine then brought this action against Mohasco and Louisa to have its rights declared under both the licensing agreement and its contract with Louisa.[9]

◼ The nature and quality of a person's contact with a state that will serve as the basis for the exercise of *in personam* jurisdiction over that person by the state is not a subject of easy description. We have come a long way since the simplistic rule of Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878), that " \* \* \* [p]rocess from \* \* \* one state cannot run into another state \* \* \*." 95 U.S. at 727. Presence of the defendant in the forum state at the time process is served is no longer required. Our courts have moved "away from the bias favoring the defendant toward [a policy] permitting the plaintiff to insist that the defendant

come to him" when a sufficient basis exists for such insistence.[10] In early attempts to pay lip service to the dogma of *Pennoyer* while still sustaining jurisdiction over non-residents, the court tried to define that sufficient basis by fictionalized approaches, such as "implied consent," "presence," and "doing business."[11] But those approaches failed to " \* \* \* [put] the real question \* \* \* "[12] and in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the United States Supreme Court broke with the past[13] and established a new test:

" \* \* \* due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " 326 U.S. at 316, 66 S.Ct. at 158.

Today, it can no longer be doubted, if it ever was,[14] that the doing of an act or the causing of a consequence in the forum state by the defendant can satisfy the requirements of the "minimum contacts" test.[15]

---

9. Louisa apparently submitted to the jurisdiction of the District Court; so no question can be raised concerning jurisdiction over that corporation.

10. Von Mehren and Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1128 (1966); see also Hazard, A General Theory of State-Court Jurisdiction, 1965 Sup.Ct. Rev. 241 (1965).

11. The evolution from these approaches to the "minimum contacts" test has been the subject of much comment. E. g. Kurland, The Supreme Court, The Due Process Clause and the In Personam Jurisdiction of State Courts, 25 U.Chi.L.Rev. 569, 569–86 (1958) Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill. L.F. 533 (1963); note, Developments in the Law—State Court Jurisdiction, 73 Harv.L.R. 909, 916–35 (1960).

12. Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 141 (2d Cir. 1930) approved

International Shoe Co. v. State of Washington, 326 U.S. 310, 316–317, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

13. At one time it might have been argued that *International Shoe* only attempted to reconcile the past cases rather than establish a new test, but later cases have shown that it was indeed the beginning of a new approach. Kurland, supra, Note 11, at 586.

14. See, Hess v. Pawlowski, 274 U.S. 352–353, 47 S.Ct. 632, 71 L.Ed. 1091 (1927); Cf. Wuchter v. Pizzutti, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1928).

15. See, McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961). See generally, Reese and Galston, Doing an Act or Causing a Consequence as Bases of Judicial Jurisdiction, 44 Iowa L.Rev. 249 (1959).

But "traditional notions of fair play and substantial justice" is hardly a precise and definitive standard; it gives us no more basis for judging than the highly amorphous and ultimately subjective standard of reasonableness.[16] As we have noted before, application of the test " * * * must * * * be worked out with reference to the facts of a particular case * * * " Velandra v. Regie Nationale Des Usines Renault, 336 F.2d 292, 295 (6th Cir. 1964). On the other hand, the test does at least state the real issue; and after twenty-three years of application, it can no longer be considered an unknown quantity. Although the test can never be stated as a dogmatic principle à la Pennoyer, a general outline of its present outermost limits can be derived from pertinent Supreme Court opinions, and decisions of the other federal courts will aid in applying the rule thus derived to particular facts.

When considering a single act as the basis of in personam jurisdiction, the two most pertinent Supreme Court cases after International Shoe are McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In McGee, the only contacts of a Texas insurance company with California were the mailing of a reinsurance certificate and premium notices into the State and the receiving of the signed certificate and premium payments by mail from the State on only one policy insuring a California resident. Upholding the jurisdiction of a California court over the Texas insurance company in a suit by a California beneficiary of the policy, the Supreme Court said: "It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." 355 U.S. at 223, 78 S.Ct. at 201.

Hanson v. Denckla, supra served notice, however, that an interest in the plaintiff or an interest in the cause of action are not by themselves sufficient to justify a state issuing process beyond its borders. In that case, the Court held that Florida could not assume in personam jurisdiction over a Delaware trustee of a trust that was executed in Pennsylvania by a domicile of Pennsylvania who later moved to Florida. Noting the trend toward expanding personal jurisdiction over non-residents, the Court cautioned that to satisfy the requirements of due process " * * * it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240.

■ From these two cases, three criteria emerge for determining the present outerlimits of in personam jurisdiction based on a single act. First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.[17]

■ Applying these criteria to the instant case, we first approach the sine

16. Cf. Restatement (Second), Conflict of Laws §§ 42(1), 47(2), 50 and 52 (Tentative Draft 1967); Reese, Judicial Jurisdiction Over Non-Residents; The Impact of McGee v. International Life Insurance Company, 13 Record of N.Y.C. B.A. 139, 140–141 (1958).

17. A similar approach to the problem of in personam jurisdiction is apparently followed in at least three other Circuits. L. D. Reeder Contractors of Arizona v. Higgins Industries, 265 F.2d 768 (9th Cir. 1959); Aftanase v. Economy Baler Company, 343 F.2d 187 (8th Cir. 1965); Curtis Publishing Company v. Birdsong, 360 F.2d 344, 352–353 (5th Cir. 1966) (Rives, J. concurring). See also, Note, Jurisdiction Over Non-Resident Corporations Based on a Single Act: A New Sole for International Shoe, 47 Georgetown L.J. 342, 351 (1958).

*qua non* for *in personam* jurisdiction: Has Mohasco purposefully availed itself of the privilege of transacting business in Tennessee? In considering this question, we can first dispose of those matters that are immaterial. For example, Mohasco has denied that any of its agents have been physically present in Tennessee concerning any matter related to the licensing agreement. Physical presence of an agent is not necessary, however, for the transaction of business in a state.[18] The soliciting of insurance by mail,[19] the transmission of radio broadcasts into a state,[20] and the sending of magazines and newspapers into a state to be sold there by independent contractors [21] are all accomplished without the physical presence of an agent; yet all have been held to constitute the transaction of business in a state.[22] Similarly, the contention that Southern Machine solicited the license agreement from Mohasco is immaterial. Shealy v. Challenger Manufacturing Company, 304 F.2d 102 (4th Cir. 1962). Mohasco chose to deal with Southern Machine; and as Judge Sobeloff noted in *Shealy,* it cannot diminish the purposefulness of Mohasco's choice that " * * * [Mohasco,] like the maker of the better mousetrap, is fortunate enough to get the business without active solicitation * * *." 304 F.2d at 104. Likewise, the technicalities of the execution of the contract and the contractual provision that the contract was made in New York and was to be interpreted according to the law of New York cannot change the business realities of the transaction.[23] Cf. Bach v. Friden Calculating Mach. Co., 167 F.2d 679 (6th Cir. 1948); Abel v. Albina Engine & Machine Works, 284 F.2d 510, 513 (10th Cir. 1960). Legal principles designed for choice of law purposes or for the purpose of interpreting a contract are not sufficient guides for measuring the power of a state to issue process beyond its borders. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

■ We are applying a constitutional standard defined in the broadest terms of "general fairness" to the defendant. Cf. Perkins v. Benquet Mining Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952). For the purposes of that standard, business is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant have a realistic impact on the commerce of that state; and the defendant has purposefully availed himself of the opportunity of acting there if he should have reasonably foreseen that the transaction would have conse-

---

18. Also presence of a corporate agent is not by itelf a sufficient basis for jurisdiction; the presence must be for the purpose of conducting business in the state. Kaye-Martin v. Brooks, 267 F.2d 394 (7th Cir. 1959); Blount v. Peerless Chemicals (P.R.), Inc., 316 F.2d 695 (2d Cir. 1963).

19. McGee v. Internatonal Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Schutt v. Commercial Traveler's Mutual Accident Ass'n, 229 F.2d 158 (2d Cir. 1956); Parmalee v. Iowa State Traveling Men's Ass'n, 206 F.2d 518 (5th Cir. 1953); Cf. Travelers Health Association v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).

20. WSAZ, Inc. v. Lyons, 254 F.2d 242 (6th Cir. 1958).

21. Buckley v. New York Post Corporation, 373 F.2d 175 (2d Cir. 1967); Curtis Publishing Company v. Golino, 383 F.2d 586 (5th Cir. 1967).

22. Although some state statutes might require the physical presence of an agent, the constitutional limits clearly extend further. Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951, 955 (2d Cir. 1967).

23. In Travelers Health Association v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), the Supreme Court rejected " * * * the contention * * * that a state's power to regulate must be determined by a 'conceptualistic discussion of theories of the place of contracting or of performance.' Instead we accorded 'great weight' to the 'consequences' of the contractual obligations in the state where the insured resided and the 'degree of interest' that state had in seeing that those obligations were faithfully carried out." 339 U.S. at 647–648, 70 S.Ct. at 929–930. Legislative jurisdiction and jurisdiction to adjudicate were involved in that case, but the opinion stated the above principle as applicable to both.

quences in that state.[24] There can be little doubt that both of these tests are satisfied in this case.

 Mohasco dealt directly with a Tennessee corporation whose only manufacturing plant was located in Chattanooga.[25] The subject of the transaction was a licensing agreement that called for the manufacture of tufting machines at that plant and that contemplated the marketing of the tufting machines in Tennessee as well as other states.[26] Machines manufactured under the agreement have in fact been sold or leased in Tennessee to E'Con Carpet Mills, Inc., and Mohasco has presumably obtained royalties from that buyer or lessee. The license agreement's direct impact on the commerce of Tennessee can hardly be denied, and it can also hardly be denied that the parties contemplated such an impact at the time the license agreement was executed.

So it is clear that Mohasco has purposely availed itself of the privilege of transacting business in Tennessee; therefore, we can proceed to the second inquiry: Does the cause of action arise from the business transacted in the State? This question can be disposed of shortly. Although Mohasco argues that this controversy arises from Louisa's refusal to perform under its contract with Southern Machine, that argument misses the gist of the declaratory relief sought and ignores the business realities of the licensing agreement. Southern Machine was licensed by Mohasco to manufacture attachments, the manufacturing of which

was allegedly protected by Mohasco's exclusive power to license. When it entered into the agreement, Southern Machine probably could reasonably assume that Mahasco would place restrictions on other manufacturers similar to those placed on Southern Machine and, thus, that it would be able to effectively compete in the sale of the attachments. Presumably, Southern Machine went to some expense in producing the marketing the attachments. Since the patents covering the attachments have been held invalid in one Circuit, Southern Machine's continuing rights and obligations under the license agreement have a questionable status. Cf. Drackett Chemical Co. v. Chamberlain Co., 63 F.2d 853 (6th Cir. 1933).

In any case, events subsequent to the execution of the license agreement have placed Southern Machine in a dilemma that is graphically presented in the instant controversy. Louisa has refused to pay Mohasco a royalty to use attachments that the Fifth Circuit has said are part of the public domain. Since Southern Machine cannot sell attachments to anyone who is not licensed by Mohasco, it is now presented with a Hobson's choice: it can complete the sale to Louisa, risking a suit by Mohasco for breach of the license agreement, or it cannot refuse to complete the sale and sue Louisa for breach of contract, risking the possibility that Louisa is right in its refusal to take a use license. Instead of foundering on the horns of this dilemma and instead of choosing to repudiate the license agree-

---

24. Reasonable foreseeability has been considered an appropriate test for legislative jurisdiction. Compare, Young v. Masci, 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158 (1933), with Scheer v. Rockne Motors Corp., 68 F.2d 942 (2d Cir. 1934). In the context of this case, the same considerations would seem to apply to the exercise of judicial jurisdiction. See also, Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill.L.F. 533, 549 (1963).

25. A purposeful contact might be more difficult to find when the defendant deals in the state only indirectly through independent subsidiaries. Velandra v. Regie Nationale Des Usines Renault, 336 F.2d

292 (6th Cir. 1964). But the separation of the parent corporation from the commerce of the state must be real and not merely superficial. Moore-McCormack Lines, Inc. v. Bunge Corporation, 307 F.2d 910 (4th Cir. 1962); Massey-Ferguson Limited v. Intermountain Ford Tractor Sales Company, 325 F.2d 713 (10th Cir. 1963).

26. Compare, Atwood Hatcheries v. Heisdorf & Nelson Farms, 357 F.2d 847, 853–854 (5th Cir. 1966); Frazier, III v. Alabama Motor Club, Inc., 349 F.2d 456 (5th Cir. 1965); Japan Gas Lighter Association v. Ronson Corp., 257 F.Supp. 219, 235 (D.N.J.1966).

ment, thus risking a suit for patent infringement, Southern Machine has elected to finally resolve the present conflict and to make its future course under the license agreement clear by means of this declaratory judgment action.[27]

The above analysis[28] shows that many of the operative facts of this controversy arose from obligations created by the license agreement and from acts performed under that agreement.[29] Mohasco's participation in establishing those obligations and in setting in motion that performance is clear. Compare, Japan Gas Lighter Association v. Ronson Corp., 257 F.Supp. 219, 234–235 (D.N.J. 1966). To suggest that Mohasco should not be joined in this action because it has been guilty of no breach of contract or bad faith conduct places the emphasis on the wrong consideration. *In personam* jurisdiction is not assumed as punishment for the commission of a tort or the breach of a contract. Its assumption is not based on the fault of the defendant but on the interest of the state. A state

has as much interest in resolving business differences before they cause damage as it has in providing a remedy once the damage has occurred.

Since it is clear that this cause of action arises from the licensing agreement, we must confront the final question: Does the licensing agreement have a substantial enough connection with Tennessee to make it reasonable to compel Mohasco to come to Tennessee to defend this suit? We think it does.

Ultimately, our decision must depend upon a determination of whether Tennessee has an interest in resolving the conflict at issue; but, once the first two questions have been answered affirmatively, resolution of the third involves merely ferreting out the unusual cases where that interest cannot be found.[30] In this case, we are aided somewhat in that determination by the Tennessee legislators, who have declared that State's interest in any cause of action arising from any business transaction in Tennessee.[31] As Judge Friendly noted in Buck-

---

27. It is suggested that the nature of the cause of action is an important consideration. If that suggestion implies that declaratory judgment actions are inferior to actions for damages, it misses the mark. The only requirement is that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities. The appropriateness of the declaratory judgment remedy in this case is apparent. If the controversy is not resolved now, this dilemma will confront Southern Machine repeatedly throughout the lifetime of the license agreement.

28. The analysis accepts the complaint as well pleaded and expresses no view as to this Court's opinion concerning the correctness of the facts set out.

29. Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract. See, Gelfand v. Tanner Motor Tours, Ltd., 339 F.2d 317 (2d Cir. 1964); Scheidt v. Young, 389 F.2d 58, (3d Cir. 1968); Dragor Shipping Corporation v. Union Tank Car Company, 361 F.2d 43 (9th Cir. 1966); Kourkene v. American BBR, Inc., 313 F.2d 769 (9th Cir. 1963).

30. For example, if Louisa attempted to sue Mohasco in Tennessee for damages occurring in Kentucky as a result of some defect in the patent design of an attachment bought from Southern Machine, it could be admitted that Mohasco was engaged in business in Tennessee and that the cause of action arose from that business without conceding jurisdiction. For Tennessee would have no interest in resolving that controversy. Compare, Blount v. Peerless Chemicals (P.R.), Inc., 316 F.2d 695, 700 (2d Cir. 1963).

31. Cases of isolated torts by corporate agents in states having no other relevant contact with the defendant corporation seem to have never given the courts any difficulty. Dealer's Transport Co. v. Reese, 138 F.2d 638 (5th Cir. 1943) (nonresident motorists act applied to foreign corporation); Elkhart Engineering Corporation v. Dornier Werke, 343 F.2d 861 (5th Cir. 1965). It is difficult to see why isolated business transactions should stand on a different footing. A difference of constitutional proportions between a state's interest in securing reasonable business expectations and a state's interest in remedying torts is not easily discernible. See Note, 73 Harv.L.Rev. 909, 926 (1960) supra Note 11.

ley v. New York Post Corporation, 373 F. 2d 175 (2d Cir. 1967):

"Once we free our minds from traditional thinking that the plaintiff must inevitably seek out the defendant, such a doctrine would not seem to violate basic notions of fair play; any view that it does must rest on an inarticulate premise, which a legislature is free to question, that plaintiffs are much more given to making unjust claims than defendants are to not paying just ones." 373 F.2d at 181.

We should be careful not to subvert the expressed interest of Tennessee by a too grudging interpretation of the long arm statute or a too restrictive view of the requirements of due process.[32]

▮▮▮▮ That interest of the State cannot be measured by "a little more or a little less," International Shoe Co. v. State of Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945); it is not diminished simply because only one contract is relied upon as the basis of jurisdiction.[33] Gkiafio v. Steamship Yiosanos, 342 F.2d 546 (4th Cir. 1965); Kokomo Opalescent Glass Co. v. Arthur W. Schmid Inter., Inc., 371 F.2d 208 (7th Cir. 1966); Swanson Painting Company v. Painters Local Union No. 260, 391 F.2d 523 (9th Cir. 1968); Houston Fearless Corp. v. Teter, 318 F.2d 822 (10th Cir. 1963); Hull v. Gamblin, 390 F.2d 462

(D.C. Cir. 1968). And when the contract is with a resident of Tennessee, the State's interest in resolving a suit based on the contract and brought by that resident cannot be doubted. See, Washington v. Hospital Service Plan of New Jersey, 120 U.S.D.C.App. 211, 345 F.2d 105, 108 (1965); Buckley v. New York Post Corporation, 373 F.2d 175, 181 (2d Cir. 1967); Cf. McGee v. International Life Insurance Company, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Besides this contract is not a one-shot affair. Mohasco has retained substanial control over the manufacture and marketing of the attachments, and it is of no legal significance whether Mohasco has in fact exercised those powers. Atwood Hatcheries v. Heisdorf & Nelson Farms, 357 F.2d 847, 850 n. 7 (5th Cir. 1966). The agreement contemplates a long continuing relationship between Mohasco and Southern Machine. Mohasco apparently thought that it could profit from such an arrangement, and it has in fact received a return from the agreement. Compare Atwood Hatcheries v. Heisdorf & Nelson Farms, supra at 853–854; and Japan Gas Lighter Association v. Ronson Corp., 257 F.Supp. 219, 234–236 (D.N.J. 1966). Tennessee has a continuing interest in this continuing relationship, and apparently Mohasco has a continuing interest in profiting from the Tennessee

---

32. In Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court noted that one important distinguishing feature of McGee was that California " * * * had enacted special legislation * * * to exercise * * * its 'manifest interest' in providing effective redress for citizens * * *." 357 U.S. at 252, 78 S.Ct. at 1239. This same deference for a state legislature's determination of a state's interest was indicated by an in chambers decision of Mr. Justice Goldberg in a case concerning the New York Long Arm Statute. Rosenblatt v. American Cyanamid Company, 86 S.Ct. 1, 3–4, 15 L.Ed.2d 39 (1965). Cf. Henry L. Doherty & Co. v. Goodman, 294 U.S. 623, 627–628, 55 S.Ct. 553, 79 L.Ed. 1097 (1935).

33. The record in this case is not well developed concerning Mohasco's other con-

tacts with Tennessee. The extent of its sales, the contacts of its salesmen and divisions, and its other patent licensing activities might be sufficient enough to make Mohasco amenable to suit even for claims not related to the " 'mainstream' of its commercial intercourse within the state." Sanders Associates, Inc. v. Galion Iron Works & Mfg. Co., 304 F.2d 915, 923 (1st Cir. 1962). If the license agreement with Southern Machine was an insufficient basis for jurisdiction, it would be appropriate to remand the case for further findings. Agrashell, Inc. v. Bernard Sirotto Company, 344 F.2d 583 (2d Cir. 1965); Lone Star Motor Import, Inc. v. Citroen Cars Corp., 288 F.2d 69 (5th Cir. 1961). Since we find that agreement sufficient, we need not consider the other issue and only mention it in passing.

market.[34] It cannot complain if along with the profits from the Tennessee market it must also accept the process from the Tennessee courts.[35]

Throughout the opinion, this Court has taken the uncontested facts in the complaint and affidavits as true and from those facts has drawn reasonable inferences pertinent to the issues of *in personam* jurisdiction. In so doing, this Court expresses no view as to the probable outcome of the suit in a trial on the merits. The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

34. Due process requires only that a defendant not be "compelled to defend himself in a court of a state with which he has no relevant connection." Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill.L.F. 533, 534 (1963).

35. From the record before us, it appears that a balancing of the inconveniences to the parties might also go against Mohasco, but that consideration is more pertinent in determining whether the Eastern District of Tennessee is an appropriate forum than in determining whether it is a permissible forum. Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116, 121 (2d Cir. 1967); see 28 U.S.C. § 1404(a). That issue is not raised or considered here.